UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

CENTRAL DIVISION



FILED
JUN 0 9 2017

| UNITED STATES OF AMERICA, | 3:16-CR-30051-RAL |
|---|---|
| Plaintiff, | |
| vs. | OPINION AND ORDER ADOPTING REPORT AND RECOMMENDATION AND DENYING MOTION TO SUPPRESS |
| MARTIN REZAC, | |
| Defendant. | |

Defendant Martin Rezac moved to suppress a statement he gave on November 27, 2015, to two agents of the Federal Bureau of Investigation (FBI). Doc. 24. After holding an evidentiary hearing, Magistrate Judge Mark A. Moreno issued a Report and Recommendation for disposition of Motion to Suppress Statements, recommending that Rezac's motion be denied in its entirety. Doc. 54. Rezac filed objections to that Report and Recommendation, contending: 1) that Rezac's oral waiver of his Miranda rights was not knowing, voluntary, and intelligent; and 2) that Rezac's statements were not voluntary because he was misled about why the FBI wanted to interview him. Doc. 55 at 2–3. This Court has conducted a de novo review of the record, overrules Rezac's objections, adopts the Report and Recommendation, and denies the Motion to Suppress.

I. Facts

In late November of 2015, Rezac suffered serious injuries in an explosion at his home in South Dakota. Due to the extent of the injuries, Rezac was transported to Regions Hospital in St.

1

Paul, Minnesota. Ex. 1 at 4:10. The medical records state that Rezac sustained a "blast injury while making flash paper for amateur magic," Doc. 46 at 84,[1] and this is what Rezac initially maintained during the interview, Ex. 1 at 1:34.

On November 27, 2015, around 6:00 p.m., FBI agents Bradley Murkins and Gina Palokangas interviewed Rezac in his hospital room at Regions Hospital. See Ex. 1. South Dakota authorities suspected that Rezac was involved with explosives and requested that Special Agent Murkins, who had a background as a bomb technician, interview Rezac. Tr.[2] at 6–7. The FBI agents spoke with the charge nurse to ask if they could speak to Rezac, and she told them that they could. Tr. at 7. Rezac was on a hospital bed, reclined, and on some pain medication. Tr. at 7. Nearly all of the FBI agents' conversation with Rezac is recorded, Ex. 1, with the recording beginning at 6:18 p.m. and lasting until 6:59 p.m, Tr. at 17. All but a brief introduction is captured on the recording. Tr. at 10.

After introducing themselves and showing their FBI credentials, Tr. at 8, Special Agent Murkins read Rezac his Miranda rights off of the FC-395 card, Tr. at 8–9; Ex. 1 at :30. Rezac nodded his understanding after hearing each right read to him. Tr. at 9. Rezac's primary injuries were to his hands, and his hand was sufficiently injured that the FBI agents did not ask him to sign a waiver of rights form. Tr. at 9. Special Agent Murkins asked if Rezac was willing to waive his rights, and Rezac responded "yeah." Tr. at 18; Ex. 1 at 1:03. Rezac then said "to a certain extent" and something like "until I feel uncomfortable" as Special Agent Murkins was announcing the time to be 6:18 p.m. Tr. at 18; Ex. 1 at 1:19.

The FBI agents questioned Rezac about various matters, and Rezac spoke extensively about chemicals used to make explosive devices and the source of his information on that

---

[1] This part of Doc. 46 was Exhibit 3 at the Suppression Hearing.
[2] "Tr." refers to the Transcript of the Suppression Hearing held on May 11, 2017.

2

subject. Ex. 1 at 5:00–11:35. Initially, Rezac stated he was making flash powder for magic, that he had made it only a few times before, and that he placed in it paper tubes or pill bottles that he threw down prairie dog holes. Ex. 1 at 24:05–27:14. Rezac eventually admitted making hexamethylene triperoxide (HMTD), but said he intended to use the HMTD to shoot rockets into the air. Ex. 1 at 29:29, 33:45. Rezac repeatedly denied having additional explosives in his home or anything else that would be injurious to anyone visiting his home. Ex. 1 at 20:47, 22:53, 24:55, 30:30, 36:00. Rezac also repeatedly denied making any threats to the Veterans Administration (VA), including specifically to the Hot Springs campus, because "no, we can't hurt people." Ex. 1 at 16:21, 35:23.

At one point, Rezac asked if the FBI agents would hand him a drink, and Special Agent Murkins immediately responded "yea, sure," at which point Agent Palokangas seems to have helped Rezac drink because of his hand injuries. Ex. 1 at 14:05. Rezac then began coughing about midway through the interview, and Special Agent Murkins asked if Rezac was alright and if he wanted something to drink. Ex. 1 at 21:31. Special Agent Murkins offered to stop for awhile after Rezac said he needed to use his nebulizer. Ex. 1 at 21:38. As Special Agent Murkins was announcing that he was going to stop the interview for a break, Rezac interrupted and said, "no, I ain't planning on blowing nothing up or making nothing like that," continuing the interview. Ex. 1 at 21:45. About twenty minutes later, at 6:59 p.m., the interview ended and the FBI agents left, after informing Rezac that they may be back for further questioning, but he would have his Miranda rights read to him again, and he could choose whether or not to speak to the agents. Ex. 1 at 41:15.

Rezac was indicted on three counts on April 13, 2016. Doc. 1. Count I alleges that on December 11, 2014, Rezac used a telephone to willfully threaten to damage and destroy a

3

building on the Hot Springs Campus of the VA Black Hills Health Care System by means of an explosive device in violation of 18 U.S.C. § 844(e). Doc. 1 at 1. Count II alleges that between June 1, 2015, and November 26, 2015, Rezac used a telephone to threaten to kill, injure, and intimidate a registered nurse at the VA Medical Center in Sioux Falls, and to damage and destroy a building on the Sioux Falls Campus of the VA Sioux Falls Health Care System by means of an explosive device in violation of 18 U.S.C. § 844(e). Doc. 1 at 1–2. Count III alleges that on November 27, 2015, Rezac made false statements and representations to FBI Special Agents Murkins and Palokangas regarding the nature of explosive and dangerous items at his residence, in violation of 18 U.S.C. § 1101. Doc. 1 at 2.

## II. Discussion

### A. Standard of Review

This Court reviews a report and recommendation pursuant to the statutory standards found in 28 U.S.C. § 636(b)(1), which provides that "[a] judge of the [district] court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). In particular, a district court can "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." Id. Rezac objects to the Report and Recommendation because he believes that his waiver of Miranda rights was invalid and his statements were not voluntary.

### B. Miranda Rights and Waiver Thereof

The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself . . . ." U.S. Const. amend. V. In Miranda v. Arizona, the Supreme Court of the United States declared that the government cannot use statements of the defendant that derive "from custodial interrogation of the defendant unless it demonstrates the

use of procedural safeguards effective to secure the privilege against self-incrimination." 384 U.S. 436, 444 (1966). The Supreme Court explained that custodial interrogation means "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Id. Thus, there are two predicates that need to be satisfied in order for Miranda warnings to apply: 1) the suspect must be in custody or otherwise deprived of freedom of action; and 2) there must be an interrogation. See id. If both custody and interrogation exist, suspects are constitutionally entitled to be given Miranda warnings. See id. at 444–45. There is a question whether Rezac was in custody or deprived of his freedom of action when he was interviewed on November 27, 2015.

Whether a suspect is in custody turns on an objective, two-part inquiry: "first, what were the circumstances surrounding the interrogation; and, second, given those circumstances, would a reasonable person have felt he or she was at liberty to terminate the interrogation and leave." J.D.B. v. North Carolina, 564 U.S. 261, 270 (2011) (quoting Thompson v. Keohane, 516 U.S. 99, 112 (1995)); see also United States v. Thomas, 664 F.3d 217, 222 (8th Cir. 2011). "Because the custody determination focuses on how a reasonable person in the suspect's position would have felt, the 'subjective views harbored by either the interrogating officers or the person being questioned are irrelevant.'" United States v. Bear, No. 3:14-CR-30122-RAL, 2015 WL 1969413, at *4 (D.S.D. May 1, 2015) (quoting J.D.B., 564 U.S. at 271).

"[R]elevant factors to be considered in making a determination of custody include an accused's freedom to leave the scene, and the purpose, place and length of the interrogation." United States v. Griffin, 922 F.2d 1343, 1348 (8th Cir. 1990). In Griffin, the Eight Circuit set forth several common "indicia of custody" considerations relating to "police practices employed

during questioning which tend to either mitigate or aggravate an atmosphere of custodial interrogation." Id. at 1349. Those factors are:

> (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; or, (6) whether the suspect was placed under arrest at the termination of the questioning.

Id. The Griffin indicia factors, while instructive, are not dispositive or exhaustive. Id.; see also Thomas, 664 F.3d at 222; United States v. Brave Heart, 397 F.3d 1035, 1039 (8th Cir. 2005); United States v. Czichray, 378 F.3d 822, 827 (8th Cir. 2004). They are merely one means of analyzing whether the suspect had a reasonable subjective belief that his "freedom of action [was] curtailed to a degree associated with formal arrest" and "whether that belief [was] objectively reasonable under the circumstances." Griffin, 922 F.2d at 1349 (internal quotation omitted). The Eighth Circuit stated in Griffin that "[t]he most obvious and effective means of demonstrating that a suspect has not been taken into custody . . . is for the police to inform the suspect that an arrest is not being made and that the suspect may terminate the interview at will." Id. (internal citation and quotation marks omitted). Rezac, while hospitalized and thus somewhat restricted by his physical condition, was not in custody and was free to leave, or at least tell the FBI agents to leave.

This question of whether the FBI interview was custodial ultimately is academic because the FBI agent read Rezac his Miranda rights. Ex. 1 at :30. Rezac knowingly waived his Miranda rights with a verbal "yeah" in response to the question of whether he was willing to waive his rights. Tr. at 18; Ex. 1 at 1:02. A valid waiver of Miranda rights means a free and deliberate

6

choice not produced through "intimidation, coercion, or deception," that was made "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." Berghuis v. Thompkins, 560 U.S. 370, 382–83 (2010) (quoting Moran v. Burbine, 475 U.S. 412, 421 (1986). A court is to consider the totality of the circumstances in determining when a waiver of Miranda rights is valid. Burbine, 475 U.S. at 421.

Rezac points to his hospitalization, serious hand injuries, recent surgery and pain and medication therefor as indications that his waiver of Miranda rights was invalid. Doc. 55 at 2–3. Rezac in fact was laying in a hospital bed after having surgery due to serious injuries, was in some degree of pain, and was on medication for that pain. Rezac's medical records received in evidence document that Rezac was in pain and on medications, but was able to converse voluntarily and intelligently. At noon on November 27, 2015, Rezac rated his pain as 8-9 out of 10. Doc. 46 at 79; Ex. A. At 5:46 p.m., on November 27, 2015, Rezac was awakened from his sleep, rated his pain at 7 out of 10, and said that his pain was improved, although he still felt burning, numb, and tingling sensations in his hand. Doc. 46 at 82; Ex. A. The FBI agents interviewed Rezac between 6:18 p.m. and 6:59 p.m. Tr. at 17. At 11:03 p.m., on November 27, 2015, Rezac, according to medical records, "was able to tell a war story without difficulty; was able to laugh." Doc. 46 at 83; Ex. 3. The charge nurse told the FBI agents that they could interview Rezac. Tr. at 7.

Rezac indicated an understanding of his Miranda rights and chose to waive them. Ex. 1 at 1:02. During the interview, Rezac answered questions in a coherent and logical manner. Rezac's tone and answers demonstrate a clarity of thought and willingness to answer, and Rezac voiced a willingness to continue answering questions even after a point when Special Agent

Murkins offered to break. Ex. 1 at 21:35. During the interview, Rezac gave several long explanations and backstories, and even chuckled at one point. Ex. 1 at 16:45, 18:40, 31:48.

Rezac's condition at the time of the interview was far different than the situation in Mincey v. Arizona, 437 U.S. 385 (1978), where the defendant was depressed almost to the point of a coma, suffering "unbearable" pain, unable to think coherently, "encumbered by tubes, needles and breathing apparatus," forced to write out answers on pieces of paper, and falling in and out of consciousness. Id. at 398–99. Rather, Rezac's condition at the time of the interview was much closer to that of defendants whose waivers of Miranda rights, despite being hospitalized with serious conditions and on pain killers, were held to be valid. See United States v. Cristobal, 293 F.3d 134, 140–43 (4th Cir. 2002) (defendant's waiver of his Miranda rights, prior to police officers conducting interrogation of him while hospitalized, was valid even though he had been given pain killers and narcotics before the waiver); United States v. Morris, 287 F.3d 985, 988–89 (10th Cir. 2002) (defendant's Miranda waiver and statements to agent while he was in the hospital and on pain killer medication after being shot twice were knowingly, voluntarily and intelligently made and were not coerced); United States v. Guay, 108 F.3d 545, 550 (4th Cir. 1997) ("[A] defendant may voluntarily waive his rights even when in the hospital, on medication, or in pain."). Rezac's waiver of his Miranda rights on November 27, 2015 was knowing, voluntary, intelligent and thus valid.

**C. Voluntariness of Rezac's Statements**

Rezac's second and final objection to the Report and Recommendation concerns whether his statements to the FBI agents were voluntarily made. Doc. 55 at 3. Rezac argues that the FBI misled him about the purposes of the interview by not telling him that they were investigating a potential criminal offense. Doc. 55 at 3. Instead, when Special Agent Murkins said "you

8

obviously know why we are here," Rezac responded "yeah, I blowed myself up," and the FBI agents did not clear up Rezac's alleged misconception of the purpose of the interview. Doc. 55 at 3; Ex. 1 at 1:25.

The Fifth Amendment privilege against self-incrimination protects criminal defendants from being compelled by the government to incriminate themselves. Miranda, 384 U.S. at 467. A voluntary statement or confession may be used against a defendant in court, but an involuntary statement or confession may not. Schneckloth v. Bustamonte, 412 U.S. 218, 226–27 (1973). A statement is voluntary if it is the product of an "essentially free and unconstrained choice by its maker." Id. at 225–26. "A statement is involuntary when it was extracted by threats, violence, or express or implied promises sufficient to overbear the defendant's will and critically impair his capacity for self-determination." United States v. Boslau, 632 F.3d 422, 428 (8th Cir. 2011) (quoting United States v. LeBrun, 363 F.3d 715, 724 (8th Cir. 2004) (en banc)). A court must consider the totality of the circumstances to determine whether a statement is voluntary. Arizona v. Fulminante, 499 U.S. 279, 285–86 (1991). The court focuses on the conduct of the agents and the characteristics of the suspect, including the extent of police coercion, the details of the interrogation, the length of the interrogation, and the suspect's capacity to resist pressure to confess. See LeBrun, 363 F.3d at 724–26; United States v. Daniels, 775 F.3d 1001, 1004–05 (8th Cir. 2014); see also Schneckloth, 412 U.S. at 226; Wilson v. Lawrence Cty., 260 F.3d 946, 952 (8th Cir. 2001). In an effort to determine the defendant's ability to resist pressure, courts take into account the person's age, years of formal education, physical and mental condition, intelligence level, and prior experience with law enforcement. Daniels, 775 F.3d at 1005; Wilson, 260 F.3d at 952; United States v. Gallardo-Marquez, 253 F.3d 1121, 1123–24 (8th Cir. 2001); see also LeBrun, 363 F.3d at 726 ("[O]ne of the key concerns in judging whether

confessions were involuntary . . . [is] the intelligence, mental state, or any other factors possessed by the defendant that might make him particularly suggestible, and susceptible to having his will overborne." (quotation omitted)). The primary issue is "whether or not the authorities overbore the defendant's will and critically impaired his capacity for self-determination." LeBrun, 363 F.3d at 725. "The government bears the burden of persuasion and must prove by a preponderance of the evidence that the challenged statements were voluntary." Boslau, 632 F.3d at 429 (quotation omitted); see also United States v. Astello, 241 F.3d 965, 966 (8th Cir. 2001).

Rezac's Fifth Amendment rights were not violated because he voluntarily and willingly spoke with and participated in the interview with the FBI agents. At the time of the interview, Rezac was in his late 50s and had some experience in the criminal justice system. See Ex. 2. The interview was not tremendously long, lasting only about 40 minutes. See Ex. 1. The content reveals that Rezac did not lack the ability to resist pressure to confess, and indeed Rezac did not confess to making threats to the VA during the interview, although he was asked repeatedly. Ex. 1 at 16:21, 35:00. Rezac made statements minimizing his involvement with explosives throughout the interview. Ex. 1 at 23:37 (thought of putting flash powder in PVC pipe, but decided not to); Ex. 1 at 31:12 (first time he had ever tried to make HMTD); Ex. 1 at 31:45 (never told anyone else how to make HMTD). When asked the name of the friend on who's property the prairie dog holes were located, Rezac hesitated to such a degree that Special Agent Murkins pointed out the futility of lying. Ex. 1 at 25:37. When Rezac finally gave the friend's name, he explained that his hesitation was not for the reasons the agents may have thought. Ex. 1 at 26:38. The FBI agents made no threats or promises that overbore Rezac's will, and the tone of the interview remained conversational throughout. Of course, interview tactics utilized by government officers such as "claiming not to believe a suspect's explanations,

making false promises, playing on a suspect's emotions, using [the suspect's] respect for his family against him, deceiving the suspect, conveying sympathy, and even using raised voices" do not necessarily "render a confession involuntary." Brave Heart, 397 F.3d at 1041. Here, the FBI agents did not engage in such tactics, and their decision not to explain to Rezac why in particular they were interviewing him hardly rendered Rezac's statements to be involuntary.

**III. Conclusion**

Therefore, for the reasons explained above, it is hereby

ORDERED that Defendant's objections to the Report and Recommendation, Doc. 55, are overruled. It is further

ORDERED that the Report and Recommendation, Doc. 54, is adopted. It is finally

ORDERED that Defendant's Motion to Suppress, Doc. 24, is denied.

DATED this 9th day of June, 2017.

BY THE COURT:

ROBERTO A. LANGE
UNITED STATES DISTRICT JUDGE